WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. GULF STATES PAPER CORPORATION.

Civil Action No. 381.

District Court, N. D. Alabama, W. D.

Dec. 12, 1942.

Bessie Margolin, Irving J. Levy, Wm. A. Lowe, John J. Babe, and Douglas B. Maggs, all of Washington, D. C., James H. Hynes, Acting Reg. Atty., and J. H. McGuire, Jr., both of Birmingham, Ala., for plaintiff.

John D. McQueen, of Tuscaloosa, Ala., and Borden Burr (of Benners, Burr, Mc-Kamy & Forman), of Birmingham, Ala., for defendant.

McDUFFIE, District Judge.

This case came on to be heard on the complaint of plaintiff seeking to enjoin the defendant from violating the provisions of Section 15(a) (1) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 215(a) (1) (hereinafter referred to as the "Act"), charging the defendant with having "sold, shipped, delivered, transported, and offered for transportation in interstate commerce from its mill at Tuscaloosa, Alabama, goods manufactured from pulpwood, in the production of which many employees were employed in violation of Sections 6 (a) (1), 6(a) (2), 7(a) (1), 7(a) (2), 7(a) (3) of the Act"; and upon the answer and amended answer of the defendant, and the Court, after hearing witnesses in open court for several weeks, considering the exhibits in evidence, hearing oral arguments of counsel, considering the briefs filed by counsel, and taking the said case under submission, now after further consideration, makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

I. The defendant is and has been since about the year 1928, a corporation, organized and existing under and by virtue of the laws of the State of Delaware, with its principal office and place of business at Tuscaloosa, Alabama.

Since 1929, the defendant has manufactured goods produced for, sold, shipped and delivered in interstate commerce from Defendant's mill at Tuscaloosa, Alabama. The said goods include Kraft wrapping paper, Kraft bag paper, Kraft paper bags, semi-bleached or bleached paper, colored paper, colored paper bags, and by-products consisting of turpentine and tallol.

In the manufacture of these products, the defendant uses the following products which it purchases from several persons, firms and corporations: pulpwood, which constitutes the vast bulk of all the products used, together with salt cake, lime, chlorine, caustic soda, resin size, alum, starch, dyes, flour for pastes, formaldehyde, wood plugs, acetone, shellac, alcohol, and other products; all of the products purchased and used by defendant, except pulpwood, are purchased from various producers or dealers in several states.

II. The defendant in manufacturing its products, employs approximately 875 employees who are in no way engaged or used in the production of pulpwood or of any of the other products or material used by the defendant in its manufacturing processes. The defendant, as to its own employees, has not violated any of the provisions of the Fair Labor Standards Act, excepting a very few minor violations which were immediately corrected when the Regional Director or Inspectors visited the plant and called the same to the attention of the management.

III. When the defendant began manufacturing Kraft paper at its Tuscaloosa mill, the manufacture of such paper was a new industry in the State of Alabama, and the production of pulpwood used in the manufacture of defendant's products has itself become an industry of large proportion.

For a short time after beginning operations in 1928, the defendant cut some of the pulpwood from its own lands and transported it to its millyard, but in 1930, it ceased to cut and produce its own pulpwood and began purchasing and has continued to purchase its total supply thereof from others.

Since 1930, written orders have been issued to various persons for the sale and delivery of pulpwood to the millyard of defendant within thirty days from the date of such orders, which specified the number of cords at a named price per cord, as well as the dimensions of the wood.

Such pulpwood is obtained for the most part from lands from which the timber suitable for sawmill purposes had been cut, leaving only small trees growing thereon, and from the tops of such trees used for lumber or timber, and from lands on which the timber growth is largely confined to small trees.

IV. The number of persons from whom the defendant purchases pulpwood varies from month to month, from approximately 35 to 50, and in some instances the number of persons selling pulpwood directly to the defendant, together with those engaged in selling it to persons who in turn sell it to the defendant, is approximately one hundred.

The pulpwood delivered to the defendant is produced in approximately twenty counties in the State of Alabama, and a very small portion thereof in the State of Mississippi, and is transported to the defendant's mill either by rail or by truck, from distances varying from approximately five to one hundred and fifty miles. The amount of pulpwood used by the defendant is normally about 11,000 cords per month.

The defendant has nothing to do with the purchase or ownership of the stumpage from which the pulpwood is cut, except in a few instances it lends to the seller money to be used in purchasing standing timber. The repayment of such money loaned is in some instances secured by a mortgage executed to the defendant on the timber purchased, and in such instances, there is an agreement on the part of the seller that there be deducted from the proceeds of the sale of the pulpwood produced from the timber an agreed percentage of the purchase price of the pulpwood until the loan has been repaid.

V. The pulpwood sold and delivered to the defendant at its millyard is produced and delivered through various methods, substantially as follows:

Some of those from whom the defendant buys its pulpwood do not with their own organizations or employees produce the pulpwood, but buy it from persons engaged in the business of producing pulpwood, or from persons who produce pulpwood incidentally, and not as a regular business, or occasionally from farmers cutting pulpwood on their own lands, or from those who purchase pulpwood from others. A very few producers other than those above referred to, are farmers, who in clearing their lands for farming purposes or pastures, cut and sell the pulpwood therefrom, and who, in the production of said pulpwood, perform labor in conjunction with their farming operations. In a few instances the persons producing the pulpwood use only the labor of themselves and members of their families.

The cutting operations of some who sell pulpwood to the defendant involve products other than pulpwood, such as saw logs, poles, cross-ties, heading blocks and mine timbers, and who use their ownership of timber or of stumpage rights and their force of employees both for the production of pulpwood and other wood products.

VI. Substantially all of the trucks used in hauling the pulpwood sold to the defendant are owned by the persons who either themselves sell the pulpwood to the defendant or are owned by persons who sell the pulpwood to others who in turn sell the same to the defendant. A substantial num-

ber of these trucks are operated by the owners thereof or by the employees of such owners.

While many of these persons engaged in production and delivery of pulpwood have made it their principal source of income and developed it into a regular business of considerable size and importance, others have used it as a side line to their farming and other operations, and as a means of livelihood during their laying-by and off-seasons.

VII. The defendant has not in any way employed, supervised, or controlled the actions of the sellers or producers of the pulpwood or of their employees, in connection with the cutting, stacking, or hauling of the pulpwood, and its delivery to the millyard.

The defendant has no control over any of the persons who sell the pulpwood or any of their employees as to the selection of such employees, the terms or conditions of their employment, or the supervision of any of the duties of their employment, except such economic control as might result from a refusal to purchase wood produced by such persons when the defendant finds it was produced in violation of the Fair Labor Standards Act. In many instances the defendant does not know the names or number of the employees of producers engaged in the independent operations in the production and delivery of the pulpwood, and prior to the filing of this complaint, did not seek to learn the various relationships which existed between the various employers and employees engaged in the production and delivery of the pulpwood.

VIII. At all times prior to July 15, 1941 (the date of the initiation of plaintiff's investigation of the operations of those producing the pulpwood sold to the defendant), most of the pulpwood purchased by the defendant and used in the manufacture of its products was produced in violation of Sections 6(a) (1), 6(a) (2), 7(a) (1), 7(a) (2), and 7(a) (3) of the Act, 29 U.S.C.A. §§ 206(a) (1, 2), 207(a) (1–3).

A large part of this violation was due in a large measure to a lack of knowledge or a doubt on the part of the producers and sellers of pulpwood as to the provisions of the Fair Labor Standards Act and its applicability to their operations.

There existed among manufacturers for some time, doubt and uncertainty as to the application of the Act to, and the character and measure of the responsibility of manufacturers under the Act, and to what extent a manufacturer should determine and assure itself that those who sold to it material used in and for its manufacturing processes, had complied, in the production of such material, with the provisions of the Act.

For a while the Administrator of the Act gained the impression that it was not the duty of the manufacturer to police or supervise the operations of those from whom he purchased material, products or ingredients, from which his finished product was manufactured.

For a period before and after the effective date of the Act, the Administrator adopted a policy of advising and trying to teach those affected by the terms of the Act to come into compliance therewith.

IX. During the time intervening between the effective date of the Act and until about July 15, 1941 (the date of the beginning of the investigation by plaintiff), the defendant, if it had policed or investigated the independent operations of those from whom it purchased the pulpwood used in the manufacture of its products, would have ascertained that most of the pulpwood purchased by it and used in the manufacture of its products was being produced in violation of Sections 6(a) (1), 6(a) (2), 7 (a) (1), 7(a) (2) and 7(a) (3). The defendant did not, until after this suit was filed, investigate nor attempt to police, or supervise the independent operations of the sellers of any of the raw materials it purchased, but after this cause was filed and following an investigation by the plaintiff, the defendant did itself conduct an investigation of the operations of the producers and sellers of pulpwood. This investigation was diligently and fairly made under advice and supervision of defendant's counsel.

X. On the 15th day of July, 1941, the plaintiff, acting through Robert T. Amis, Regional Director, and his Chief Inspector, Robert Till, in a conference with the Secretary and Treasurer of the defendant at its offices in Tuscaloosa, Alabama, stated in substance that while there were no pending charges against the defendant, the Wage and Hour Division was making an investigation of the paper industry along the same lines that investigation had been made and recently completed in the lumber industry; that the mill of the defendant was one of the many paper mills which were being in-

vestigated and that the investigation would concern the employees of the defendant and the employees of the suppliers of wood. It was further stated that, if during the progress of the investigation or at its end, any irregularities or violations of the law developed, they would be brought to the attention of the defendant and opportunity would be given for their correction.

On July 16, 1941, in confirmation of the statements made in a conference the preceding day between plaintiff's Director and Inspector and the Secretary Treasurer of defendant, the Regional Director wrote the defendant a letter, among other things stating that the contemplated investigation "would begin the first of the next week" and that it would "cover the operations of the corporation as to its own individual operation and the operations of all persons supplying wood to the mill"; that "this investigation is merely for the purpose of determining facts relating to compliance or non-compliance with the Wage and Hour law"; that after obtaining the pertinent facts, he would "discuss them with you and other officers of the corporation and advise you of the *position of the Wage and Hour Division* as to responsibility for such violations, if any, as are developed and what disposition should be made of the case". The letter requested the "full co-operation of the defendant in carrying on this investigation", and advised the defendant that "we expect to have an inspector at your mill at Tuscaloosa, on Monday, July 21, 1941", and requested among other things "a list reflecting the names and addresses of all persons who supply you with wood, indicating the amount of purchases and unit prices by months for the past six months".

The defendant gave to the plaintiff its assistance and cooperation and furnished his representatives all information including books and dates requested of it in connection with the said investigation.

Immediately following the writing and delivery of this letter, the plaintiff began his investigation, which covered a period of substantially two months. Many investigators visited substantially all of the operations of those from whom the defendant purchased its pulpwood.

The agents of the plaintiff failed to observe their assurances above set out, and neither during such investigation, nor upon its completion, did the plaintiff make any report to defendant as to the result of its investigation; the first notice given the defendant of the result of plaintiff's investigation was the filing of this suit on January 16, 1942.

XI. The investigators of the plaintiff, in investigating the operations of those from whom the defendant purchased its pulpwood, discussed with most of the persons engaged in producing and selling pulpwood to the defendant the irregularities or violations of the Act found in their operations. Upon having these violations brought to their attention by the investigators, such producers and sellers demonstrated a willingness and desire to comply with the provisions of the Act. Some of them ceased producing and selling pulpwood to the defendant; others began at once to endeavor in good faith to come into compliance and others, after ceasing for a short time the production of pulpwood, recommenced production and selling pulpwood to the defendant and endeavored to come into compliance with the Act.

During the defendant's investigation, after finding a non-compliance with the Act, by some of the producers from whom it purchased pulpwood, the defendant paid for and segregated on its millyard such pulpwood as it knew was then in transit from non-complying producers, and it has not used in connection with its manufacturing operations any of the said pulpwood which was so produced.

The defendant, during and after its investigation, refused to make any further purchases or to receive any further deliveries of pulpwood from such non-complying suppliers, unless and until they had reasonably satisfied the defendant that the violations of the Act which had come to light had ceased, and insisted that such producers make restitution under the terms of the Act, which was done generally or in most instances.

XII. On March 23, 1942, the date of filing defendant's answer, the defendant did not have on hand any pulpwood delivered to it prior to November 1st, 1941, nor any paper or paper products of which any such pulpwood was an ingredient.

During and subsequent to the investigation made by the plaintiff, most of those engaged in the production of pulpwood purchased by the defendant, in good faith, began to come into compliance with the provisions of the Act and from and after November 1, 1941, there was a full compliance, with the exception of a very few

sellers, who, to a small extent, continued to violate some of the provisions of the Act. Some of these violations continued in a lesser degree after this time, and at the time of the closing of the hearing, there were a few violations de minimis. Such minor violations were not committed with the approval, consent or knowledge of the defendant.

XIII. The defendant, through the testimony of its responsible officers, has assured the court that it is endeavoring, in good faith, and will continue to do all that is reasonably practical to refrain from purchasing or using in the manufacture of its products, any pulpwood produced by any non-complying employer. The Court believes the defendant is doing all that is reasonably practical to refrain from purchasing or using in the manufacture of its products, any pulpwood produced in non-compliance with the Act; and, notwithstanding the violations above referred to, it finds that there is no reasonable cause for believing that the defendant will not in the future continue to live up to and keep its assurances in this regard.

XIV. The evidence does not show that from and after November 1, 1941, the prices paid for pulpwood by the defendant were inadequate to enable a reasonably efficient employer engaged in the production of pulpwood to pay his employees in accordance with the provisions of the Act and meet other necessary expenses and leave the employer a fair profit.

XV. The defendant has not threatened to purchase or use in the manufacture of its goods any pulpwood produced in noncompliance with the provisions of the Act, and beginning with the purchase orders for pulpwood issued by it in and after the month of March, 1942, the defendant has inserted in its purchase orders a provision reading as follows: "As a condition of this order, the seller warrants and agrees that all wood previously delivered hereunder has been produced and that all wood hereafter delivered hereunder will be produced in compliance with the Fair Labor Standards Act of 1938" and required all of its sellers to sign an acceptance of such purchase order.

The defendant has also insisted on its sellers keeping records in reference to the wages and hours of service of their employees and of having such records subject to inspection.

## Conclusions of Law

I. Jurisdiction of this case is conferred upon the Court by Section 17 of the Act, 29 U.S.C.A. § 217.

■ II. The question of the issuance vel non of an injunction for violating Section 15(a) of the Fair Labor Standards Act, and against an employer in reference to his own employees, should be considered and weighed differently in the exercise of the Court's discretion from the issuance of an injunction against the defendant in relation to the employees of the sellers from whom it purchases its raw material. In the first instance, the writ primarily contemplates and relates to the wages and hours of service of direct employees of which the employer of necessity has knowledge and the records of which he is required by the Act to keep himself, while in this cause the writ would relate to the wages and hours of service of hundreds of employees of many employers spread over a large territory and over whom the defendant has no supervision.

III. In determining whether or not there is "cause shown" for the issuance of an injunction, the following principles apply:

■ (1) The equities of the case must be in favor of the party seeking the injunctive relief.

■ (2) The purpose of an injunction is not to punish a guilty party for past violations, but to prevent his future noncompliance with the law.

■ (3) The issuance of the injunction, admitting past violations, should depend upon whether there is a reasonable likelihood of violations of the law in the future.

■ (4) The question as to whether more good or more harm will result from the issuance of the injunction prayed for should be considered.

■ (5) The issuance vel non of the injunction in this cause rests in the discretion of the Court.

■ IV. While the assurances of the plaintiff that he would consult with and advise the defendant of the result of his investigation does not estop the plaintiff from bringing and prosecuting this suit, this should be and is considered by the Court in weighing the question of good faith, which is an issue in this cause.

■ V. The Court has considered the government's contention that some of the

truck drivers were not paid the minimum wages fixed by the Wage Order under date of March 16th, 1942, applicable to the Property Motor Carrier Industry. The pleading, the basis for the injunction, alleges as grounds for the injunction that employees of producers were not paid at specified periods, the minimum wages prescribed by the Fair Labor Standards Act, in keeping with Section 6(a) (1), twenty-five cents an hour, Section 6(a) (2), thirty cents an hour, Sections 7(a) (1), 7(a) (2) and 7(a) (3). No mention is made in the pleading of any violation of the Wage Order relating to the Property Motor Carrier Act, 49 U.S. C.A. § 301 et seq., or Section 6(a) (4) of the Act. Under the evidence, the amount of wood hauled by the few drivers and helpers covered by such order, when considered in connection with the volume of wood bought and delivered to the defendant, is so small as not to form a proper basis for an injunction in this case.

VI. In the exercise of its discretion, the Court should deny the prayer for the injunction in this cause, and dismiss the complaint. An appropriate order will be entered.